AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Fernando Viera, a/k/a Oscar F Viera, a/k/a Oscar Fernando Viera Rodriguez, a/k/a "Tata" (see attachment for all defendants) | ) ) ) ) ) | Case No. 3-21-mj-71624 MAG |
| *Defendant(s)* | | |

FILED
Oct 13 2021
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  unknown, but no later than 4/14/21 to the present  in the county of  San Francisco  in the
 Northern  District of  California , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C) | Conspiracy to Distribute and Possess with Intent to Distribute Controlled Susbtances |

This criminal complaint is based on these facts:
See attached Affidavit of DEA Task Force Officer Brenton Reeder.

☑ Continued on the attached sheet.

Approved as to form  /s/ Sailaja M. Paidipaty
AUSA  Sailaja M. Paidipaty

/s/
*Complainant's signature*

Brenton Reeder, DEA Task Force Officer
*Printed name and title*

Sworn to before me by telephone.

Date:  10/13/2021

City and state:  San Francisco, California

Hon. Thomas S. Hixson, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CRIMINAL COMPLAINT |
| Plaintiff, | ) |
| v. | ) |
| Fernando VIERA, <br>    a/k/a Oscar F Viera, <br>    a/k/a Oscar Fernando Viera Rodriguez, <br>    a/k/a "Tata," <br> Edgardo AGUILAR-CRUZ, <br>    a/k/a "Jose" <br> Nelson CASTENEDA, and <br> Nolan RAMOS, <br>    a/k/a Nelson Ramos, | ) |
| Defendants. | ) |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Brenton Reeder, a Task Force Officer of the Drug Enforcement Administration (DEA), being sworn, hereby declare as follows:

### INTRODUCTION

1. I submit this Affidavit in support of an application for a criminal complaint charging the following persons (the "Target Subjects") with violations of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C) (conspiracy to distribute and to possess with intent to distribute controlled substances) arising from their participation in a conspiracy to sell controlled substances, including methamphetamine, cocaine, and cocaine base:

   a. FERNANDO Viera;
   b. Edgardo AGUILAR-CRUZ;
   c. Nelson CASTENEDA; and
   d. Nolan RAMOS.

2. The statements in this Affidavit are based on my own investigation; information from other law enforcement agents, investigators, and individuals with knowledge of this matter; my review of documents related to this investigation; and my training and experience as a DEA Task Force Officer. This Affidavit does not purport to set forth all of the evidence gathered to date in this investigation, or to name all of the persons who participated in these crimes; I have included only those facts and names that I believe are necessary to establish probable cause for the requested criminal complaint and arrest warrants.

### RELEVANT STATUTES

3. Under 21 U.S.C. § 846, it is unlawful for a person to attempt or conspire to manufacture, distribute, or possess with intent to distribute controlled substances, including cocaine, cocaine base, methamphetamine, fentanyl, and heroin.

4. Under 21 U.S.C. § 841(a)(1) and (b)(1)(C), it is unlawful for a person to distribute or posses with intent to distribute controlled substances, including cocaine, cocaine base,

methamphetamine, fentanyl, and heroin.

## BACKGROUND OF INVESTIGATING AGENT

5. I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

6. I am employed by the San Francisco Police Department as a Police Officer and have been so employed since May 2012. I have been a Police Officer since November of 2008. Prior to working for SFPD, I was employed as a Police Officer with the Oakland Police Department and South San Francisco Police Department. I am currently assigned as a Task Force Officer to the Drug Enforcement Administration (DEA) within the San Francisco Divisional Office in California.

7. I graduated from the Oakland Police Department academy in November of 2008. In the police academy I received 40 hours of narcotics related training. I also attended the San Francisco Police Department Detective school where I received additional narcotics investigations training. The training curriculum covered all aspects of drug investigations, including identification of controlled substances, physical surveillance, utilization of confidential sources, interview techniques, undercover operations and the general operation of drug trafficking organizations. My employment background also includes over a year with the San Mateo County Sheriff's Office as a correctional officer.

8. During the course of my employment as a Police Officer, I have participated in many controlled substance investigations either as a case agent or in a supporting role. I have debriefed confidential sources, and witnesses who had personal knowledge regarding drug trafficking organizations. In addition, I have discussed with numerous law enforcement officers and confidential sources the methods and practices used by drug traffickers. I have also participated in many aspects of drug investigations including, but not limited to, undercover operations, telephone toll analysis, records research, physical surveillance, and assisted in court

ordered wiretap investigations. Moreover, I have assisted in the execution of numerous federal and state search and arrest warrants related to illegal activities involving controlled substances that resulted in the arrest of suspects and seizure of controlled substances.

9. I have monitored, conducted surveillance, or otherwise participated in multiple investigations that utilized wire interceptions. I have also participated in writing, editing, and reviewing federal affidavits made in support of electronic interceptions.

10. Through my training, education, experience, and my conversations with other agents and officers who conduct drug investigations, I have become familiar with drug traffickers' use of mobile telephones, and their use of numerical codes and code words to conduct their business. I have become familiar with drug traffickers' methods of operation, including, but not limited to, the manufacturing, distribution, storage, and transportation of controlled substances, and the methods used by drug traffickers to collect, transport, safeguard, remit, and/or launder drug proceeds. By virtue of my training and experience, and through my conversations with other agents and officers who conduct drug investigations, I have become familiar with the methods used by drug traffickers to import, transport, safeguard, and distribute drugs, and the methods used by drug traffickers to collect, transport, safeguard, remit, and/or launder drug proceeds.

11. I have participated in the investigation discussed in this Affidavit. I have also discussed the investigation with other DEA Special Agents and with other law enforcement agencies involved in it. I have reviewed records and reports relating to the investigation. Unless otherwise noted, wherever in this Affidavit I assert that a statement was made, the information was provided by another DEA agent, law enforcement officer, or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken, or whose reports I have read and reviewed.

## STATEMENT OF PROBABLE CAUSE

I. **Overview of Investigation**

12. For several years, law enforcement agencies have been investigating networks of

drug trafficking organizations selling controlled substances in the Tenderloin neighborhood of San Francisco as well as in the greater Bay Area. As part of the instant investigation, a confidential source ("CS-1")[1] informed law enforcement that FERNANDO Viera operates as a mid-level drug trafficker in the Bay Area. Based on my participation in prior narcotics investigations over the past few years, I recognized the name and believed that FERNANDO is related to several individuals previously charged with drug trafficking in this District. See *United States v. Viera-Chirinos, et al*, No 19-0367 CRB.

13. Agents identified a phone number ending in -0824 that was used by FERNANDO. Around the same time, a DEA agent acting in an undercover capacity (UC) began purchasing fentanyl from Edgardo AGUILAR-CRUZ on the streets of the Tenderloin. During these controlled purchases, AGUILAR-CRUZ provided the UC with his phone number. Phone records revealed that FERNANDO and AGUILAR-CRUZ were in frequent contact.

14. With the assistance of the U.S. Attorney's Office, the DEA received Court-authorization to intercept wire communications over AGUILAR-CRUZ's telephone. See No 4:21-xr-90506 YGR. Intercepted communications indicated that AGUILAR-CRUZ received resale quantities of narcotics from multiple local drug suppliers, including from FERNANDO.

15. Following the initial interception period, the DEA, with assistance from the U.S. Attorney's Office, received court-authorization to intercept wire (and later electronic) communications over phones used by FERNANDO. See Nos. 21-xr-90938 YGR; 21-xr-91200 RS.

16. Over the course of the investigation, agents intercepted communications during which FERNANDO coordinated narcotics transactions with AGUILAR-CRUZ, CASTENEDA,

---

[1] CS-1 is currently under federal indictment for drug trafficking and has spoken with law enforcement with the hope of receiving leniency. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Because of CS-1's connections within local drug trafficking networks and agents' ability to corroborate information provided by CS-1, I believe that the information provided by the CS-1 with respect to this investigation is reliable.

and RAMOS. Agents also conducted surveillance of suspected narcotics transactions between FERNANDO, AGUILAR-CRUZ, and CASTENDA.

17. Law enforcement agents and officers also seized drugs from AGUILAR-CRUZ and CASTENEDA. In addition, undercover agents and confidential informants purchased drugs from AGUILAR-CRUZ, CASTENEDA, and RAMOS during the investigation.

18. The intercepted communications, surveillance and drug purchases by undercover agents and confidential informants show that each of the defendants was in the business of narcotics trafficking. AGUILAR-CRUZ, CASTENEDA, and RAMOS sold narcotics in San Francisco's Tenderloin neighborhood. FERNANDO supplied drugs to each of them. The supplier-customer relationships were ongoing as evidenced by, among other things, multiple conversations between FERNANDO and each of these customers arranging or attempting to arrange drug sales; the fact that these conversations tended not to include a lot of detail about the proposed transactions indicating that the parties had pre-existing understandings about how they would do business; and evidence of sales on credit (i.e. FERNANDO providing drugs with the expectation that he would be paid later).

**II.    Drug Trafficking Activity of AGUILAR-CRUZ.**

   **A.    Agents intercepted calls between FERNANDO and AGUILAR-CRUZ regarding narcotics trafficking.**

19. Throughout the investigation, agents intercepted numerous calls between FERNANDO and AGUILAR-CRUZ regarding suspected drug transactions. Because of the volume of these calls, I have not described all of the calls in this affidavit but provide a sample of them below.

20. During an intercepted call on April 17, 2021, at approximately 9:23 p.m. AGUILAR-CRUZ (using a phone number ending in -5992)[2] called FERNANDO (using a phone

---

[2] I believe the user of the -5992 Phone is AGUILAR-CRUZ for several reasons. First, as described in more detail below, a DEA agent acting in an undercover capacity (UC) purchased fentanyl from AGUILAR-CRUZ on ten occasions. Early on in the series of purchases, AGUILAR-CRUZ gave the UC the number to the -5992 Phone as his contact number that the UC could call to arrange additional purchases of drugs. Also as described in more detail below, recently, in September 2021, agents conducted a traffic stop of AGUILAR-CRUZ in the

number ending in -0824)³. The following is a translation of the call:⁴

| NAME | TRANSLATION |
|---|---|
| | **[Beginning of call]** |
| AGUILAR-CRUZ | [Background: voices] Hey, what's up? |
| FERNANDO | Nothing. Hey? |
| AGUILAR-CRUZ | What's up? |
| FERNANDO | I was told this crazy dude did not go, but... I'll have to go myself, but it's no problem. You know what I mean? I'm not going to pay him more either. You know what I mean? I'm going to head out right now. |
| AGUILAR-CRUZ | Bring a half (½) there. |
| FERNANDO | Half (½) and half (½) or will it be enough with the half (½)? |
| AGUILAR-CRUZ | But can I pay you tomorrow? Is that okay? |
| FERNANDO | All right, then. |
| AGUILAR-CRUZ | Listen, bring me a quarter (1/4) of "Parrot", a quarter (1/4) of "Parrot" and a half (½) of "rock". |
| FERNANDO | Yeah, you got it. |
| AGUILAR-CRUZ | All right. |
| | [Background: horn blows] |
| AGUILAR-CRUZ | Call me once you are in the area. |
| FERNANDO | You got it. |
| AGUILAR-CRUZ | All right. |
| | **[End of call]** |

21.     During this call, AGUILAR-CRUZ asked FERNANDO to bring him a "quarter of 'perico'" and a "half of 'piedra.'" FERNANDO responded, "All right." I know that "perico" is

---

Tenderloin. Prior to the traffic stop, the UC called AGUILAR-CRUZ at the -5992 Phone to arrange another transaction. During the traffic stop, the UC called the -5992 number and a phone in AGUILAR-CRUZ's possession rang. Finally, based on my participation in surveillance of the UC purchases from AGUILAR-CRUZ and the traffic stop in September, I can confirm that the AGUILAR-CRUZ is the same individual involved in all of these incidents.

³ I believe the user of the -0824 Phone is FERNANDO for several reasons. First, the phone is subscribed in the name of Oscar F Viera Rodriguez. On numerous occasions, including as recently as August 2021, FERNANDO has used the name Oscar Fernando Viera Rodriguez upon arrest and booking. Further, in December 2020, DEA Special Agent Brandon Cahill and I located FERNANDO on the 600 block of Eddy. At the time, I called the 0824 Phone and SA Cahill watched as FERNANDO pulled his phone out of his pocket, looked at the phone, and answered it. FERNANDO used the -0824 Phone during all of the calls that he was involved in that are described in this Affidavit.

⁴ Unless otherwise noted, all of the intercepted calls described in this affidavit were originally in the Spanish language. Spanish linguists reviewed the interceptions and have prepared preliminary summaries and/or transcripts of the calls. I am relying on these summaries/transcripts to form my conclusions within this affidavit. The summaries/transcripts may undergo additional review and revision, and the finalized translations may slightly differ from the language quoted herein.

the Spanish word for "parrot." Based on my training and experience, I know that "perico" is a commonly used code word for cocaine. I believe the term is used because parrots have large noses and cocaine typically is ingested through the nose. I also know that "Piedra" is the Spanish word for "rock." "Rock" is a common code word for cocaine base or crack. This is because cocaine base often looks hard and rock-like in appearance. Therefore, on this call, I believe that AGUILAR-CRUZ was asking FERNANDO for a quarter unit of cocaine and a half unit of cocaine base. Approximately 30 minutes later, FERNANDO called AGUILAR-CRUZ. The following is a translation of the call:

| NAME | TRANSLATION |
|---|---|
|  | [Beginning of call] |
| AGUILAR-CRUZ | [Background: music] What? |
| FERNANDO | [U/I]. |
| AGUILAR-CRUZ | What's up? |
| FERNANDO | I'm here. |
| AGUILAR-CRUZ | At the same spot? |
| FERNANDO | Yes. |
| AGUILAR-CRUZ | I'll come over there right now. |
| FERNANDO | All right. |
|  | [End of call] |

22. Based on the sequence of calls, I believe that AGUILAR-CRUZ was going to FERNANDO's location to pick up the drugs discussed on the prior call.

23. Two days later, on April 19, 2021, at approximately 5:23 p.m., agents intercepted a call from AGUILAR-CRUZ to FERNANDO. During the call, FERNANDO indicated that he was at home. AGUILAR-CRUZ said he would stop by to give "barra" and asked if FERNANDO had it. FERNANDO indicated that he did and AGUILAR-CRUZ said he would stop by "right now." Based on my training and experience and fluency in Spanish, I believe that the word "barra" means "bar." In the context of narcotics trafficking, this can be a reference to narcotics (e.g. pharmaceutical pills that are rectangular in shape) but most often is a reference to cash. Based on the sequence of the conversation, I believe AGUILAR-CRUZ was telling FERNANDO that he would stop by to give FERNANDO money owed for previously purchased narcotics or he was indicating that he wanted to purchase a type of narcotics and was asking if

FERNANDO had or was in possession of that type of drug.

24. Following the call, agents set up surveillance in the area of FERNANDO's residence. They saw AGUILAR-CRUZ walk out of FERNANDO's residence carrying a black bag over his shoulder. AGUILAR-CRUZ entered his car and drove away. Based on the surveillance and the intercepted call, I believe that AGUILAR-CRUZ picked up either a supply of narcotics or paid FERNANDO for narcotics purchased previously. Based on my training and experience, I know that it is common for drug traffickers to sell drugs on consignment, a practice called "fronting." The buyer then pays for the drugs after he or she resells them elsewhere.

**B.  Over the course of the investigation, an undercover DEA agent purchased fentanyl from AGUILAR-CRUZ on ten occasions.**

25. Between October 2020 through May 2021, a DEA agent in an undercover capacity (UC) purchased fentanyl (and on some occasions other drugs) on ten occasions. Because of the number of undercover purchases, I have not described all of them in this Affidavit. I have included the facts of one of the purchases below, which occurred three days after the meeting between FERNANDO and AGUILAR-CRUZ described above.

26. On April 22, 2021, at approximately 8:35 p.m., the UC contacted AGUILAR-CRUZ and requested to meet AGUILAR-CRUZ to purchase $100 worth of "fetty" and $60 worth of "crystal." Based on my training and experience, and my conversation with the UC, I know that fetty is a common code word for fentanyl, and crystal is a common reference to methamphetamine (also referred to as crystal methamphetamine). AGUILAR-CRUZ indicated that he was "there" and asked the UC, "How long?" Prior to this transaction, the UC had purchased fentanyl from AGUILAR-CRUZ in the Tenderloin. I believe when AGUILAR-CRUZ indicated that he was "there," he meant that he was in the Tenderloin near their prior meeting locations. The UC indicated that he would arrive in approximately five minutes.

27. Shortly afterwards, the UC called AGUILAR-CRUZ and stated that he would be there in 30 seconds. The UC observed AGUILAR-CRUZ on an electric scooter heading south on the East side of Hyde Street towards Turk Street in the Tenderloin. AGUILAR-CRUZ waved

the UC to the northeast corner of Turk and Hyde Streets. The UC asked AGUILAR-CRUZ for $100 worth of fetty and $60 worth of crystal. An unidentified white male held a backpack from which AGUILAR-CRUZ removed the fentanyl and methamphetamine. The UC gave AGUILAR-CRUZ $160 for approximately 2.5 grams of fentanyl and approximately 3.0 grams of methamphetamine. The two then parted ways.

28. The substances sold by AGUILAR-CRUZ were tested with a TruNarc analyzer which yielded a positive result for the presence of fentanyl and a positive result for the presence of methamphetamine, respectively.

    **C.**    **In September 2021, agents seized drugs from AGUILAR-CRUZ after intercepting conversations between FERNANDO and AGUILAR-CRUZ arranging a drug sale and surveillance of a meeting between the two that same day.**

29. On September 2, 2021, at approximately 2:56: p.m., AGUILAR-CRUZ called FERNANDO. During the call AGUILAR-CRUZ said he was at "the barbershop" and wanted FERNANDO to "come by." FERNANDO asked AGUILAR-CRUZ what he wanted. AGUILAR-CRUZ replied, "Half of the hard." AGUILAR-CRUZ told FERNANDO to bring "five eights" and FERNANDO agreed. Based on the call, agents believed that AGUILAR-CRUZ had ordered cocaine base or crack from FERNANDO. Based on my training and experience I know that "hard" is a term used to reference cocaine base or crack. This is because the cocaine base typically is hard and rock-like in appearance versus powder cocaine, which is softer. Further, I know that drugs are sold by weight and that an eighth of an ounce is a common measure by which drugs are sold. Five-eighths is slightly over half an ounce. I believe therefore on this call that AGUILAR-CRUZ was asking to purchase over half an ounce of cocaine base from FERNANDO.

30. At approximately 3:18 p.m., agents established surveillance at FERNANDO's residence in Oakland. Agents saw FERNANDO enter his car and drive away. Surveillance followed FERNANDO who ultimately parked in the parking lot of a business on International Boulevard.

31. At approximately 3:36 p.m., agents intercepted another call between AGUILAR-CRUZ and FERNANDO. During the call AGUILAR-CRUZ asked FERNANDO if he had arrived and FERNANDO said, "Yes." AGUILAR-CRUZ responded that he would be right there.

32. At approximately 3:38 p.m., surveillance units saw AGUILAR-CRUZ and a second man get into FERNANDO's vehicle. AGUILAR-CRUZ and the second man stayed inside of FERNANDO's vehicle until approximately 4:15 p.m. AGUILAR-CRUZ and the second man then got out of FERNANDO's car and got back into AGUILAR-CRUZ's car.

33. Surveillance units followed AGUILAR-CRUZ out of the parking lot and ultimately back to the area near the apartment building where AGUILAR-CRUZ lives.

34. At approximately 6:00 p.m., surveillance units saw AGUILAR-CRUZ leave his residence and walk away at which point agents were no longer able to see him. About five minutes later, AGUILAR-CRUZ arrived back at the front of his apartment building in a car driven by another individual. AGUILAR-CRUZ got out of the car and went back into his apartment building.

35. At approximately 6:25 p.m., surveillance saw AGUILAR-CRUZ and the second man mentioned in paragraph 32 leave and get back into AGUILAR-CRUZ's car. Surveillance followed the car to San Francisco to the 100 block of Page Street in the Tenderloin. At that time, an officer of the San Francisco Police Department (SFPD) conducted a traffic stop on the vehicle. AGUILAR-CRUZ and the second man were placed under arrest. Investigators conducted a search of AGUILAR-CRUZ's car and retrieved a black Nike bag on the passenger-side floorboard. The Nike bag contained a digital scale and several varieties of narcotics. Agents conducted presumptive testing using a TruNarc Handheld Narcotics Analyzer.

//
//
//

36. The following table lists the substance, approximate gross weight, and presumptive test results for the drug seized from AGUILAR-CRUZ's car:

| SUBSTANCE | APPROX. GROSS WEIGHT | PRESUMPTIVE TEST RESULTS |
|---|---|---|
| Fentanyl | 261.2 grams | Positive for fentanyl |
| Methamphetamine | 52.7 grams | Positive for methamphetamine |
| Heroin | 44.8 grams | Positive for heroin |
| Cocaine | 45.3 grams | Positive for cocaine |
| Cocaine Base | 54.7 grams | Positive for cocaine base |

37. The weights listed above reflect gross weights that include the weight of the drug and any packaging material. I believe some or all of the cocaine base seized from the car was provided to AGUILAR-CRUZ by FERNANDO earlier in the day.

### III. Drug trafficking activity of CASTENEDA.

#### A. Agents intercepted calls between FERNANDO and CASTENEDA regarding narcotics trafficking.

38. Over the course of the investigation, agents intercepted calls between FERNANDO and CASTENEDA (using a phone number ending in -2821)[5] regarding drug transactions. For example, on September 3, 2021, CASTENEDA called FERNANDO and asked for "half" of the "hard" and "half" of the "ñata." FERNANDO said, "okay" and asked if they would meet at the same location. CASTENEDA confirmed and said, "on 16th." Based on subsequent surveillance conducted by SFPD, I know that CASTENEDA lives on 16th Street in the Mission District of San Francisco.

---

[5] I believe that CASTENEDA was the user of the -2821 phone for several reasons. As describe later in this Affidavit, on September 8, 2021, SFPD officers familiar with CASTENEDA's mugshot watched CASTENEDA get into FERNANDO's car following a series of phone calls arranging a drug transaction. Further, as also described herein, a confidential informant (CI) working for the Bureau of Alcohol, Tobacco, and Firearms purchased methamphetamine from CASTENEDA on three occasions in August 2021. Prior to the third sale, CASTENEDA informed the CI that he had changed his phone number to the -2821 number.

In Re App. for Crim. Complaint 11

39. As described above, I know that "hard" is a code word for cocaine base (crack). Based on recent conversations with street-level drug traffickers, I further know that ñata is a code word used to reference powder cocaine. Therefore, on this call, I believe that CASTENEDA asked to purchase half a unit of cocaine base and half a unit of powder cocaine. FERNANDO agreed and said he would meet him at their prior meeting location, which CASTENEDA confirmed as "on 16th."

40. Five days later, on September 8, 2021, CASTENEDA again called FERNANDO. During this call, CASTENEDA asked for a "whole one" of the "hard" and asked for the price on "crystal." FERNANDO said he had "pounds" and "half pounds." CASTENEDA asked how much for a "half pound." FERNANDO initially stated that a half pound was "2,000." CASTENEDA responded that "a dude" was giving to him "at 16." FERNANDO asked if "1,600" for a pound. He then said that it would come out to "800." In response CASTENEDA told FERNANDO to bring him "one of those" and a "whole one" of the "hard." Finally, CASTENEDA said he still had "the 500" that he owed FERNANDO. He told FERNANDO to call when he was near.

41. As noted above, I know that hard is a code word for cocaine base and that crystal is a code word for methamphetamine. I believe that during this call, CASTENEDA was requesting one unit ("whole one") of crack, likely a full pound because he went on to discuss pricing for methamphetamine in pound and half pound quantities, and half a pound of methamphetamine. With respect to the methamphetamine, I believe that FERNANDO initially indicated that half a pound would cost "$2,000." In response, I believe that CASTENEDA implied that he had a different supplier ("a dude") who was selling a pound of methamphetamine for "16." Based on the context of the call, I believe FERNANDO understood CASTENEDA to imply that he could buy a pound of methamphetamine elsewhere for $1,600 because he ultimately matched that price and quoted a price for half a pound at $800. At the end of the call, when CASTENEDA noted that he had "the 500" that he owed, I believe he meant that he had $500 that he was prepared to pay to FERNANDO for a prior drug transaction. As noted above, it

is common for drug traffickers to provide narcotics to another reseller upfront and then receive payment after those drugs are resold.

42. Location data over FERNANDO's cell phone at the time of this call indicated that he was in Oakland at the time of the call arranging the transaction. About an hour later, FERNANDO called CASTENEDA and said he was there. Location data at the time indicated that FERNANDO was in the Mission District of San Francisco. CASTENEDA said he would "be down there shortly." At the time, SFPD officers saw FERNANDO parked in his car near 16th Street. An officer saw CASTENEDA get into FERNANDO's car with a black satchel over his shoulder. Moments later, CASTENEDA got out of FERNANDO's car and walked into a building on 16th Street where I believe he lives.

**B.   A confidential informant working with the ATF purchased methamphetamine from CASTENEDA on three occasions.**

43. In August 2021, a confidential informant (CI)[6] working for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) conducted three controlled purchases of methamphetamine from CASTENEDA. The purchases occurred on August 9, 11, and 19. I will not describe all three sales in this Affidavit but below summarize the final of the three transactions.

44. On August 17, 2021, CASTENEDA texted the CI from a number ending in -2821, which was the same number that was intercepted when CASTENEDA was speaking with FERNANDO. In the message, CASTENEDA noted that "this is my new number." In my training and experience, I know that drug traffickers often switch phones or phone numbers to avoid detection by law enforcement.

45. The following day, the CI texted CASTENEDA, stating, "Hey we want the same 3 tomorrow." CASTENEDA texted back., "Ok."

---

[6] Based on my discussions with ATF Special Agents, I understand that the CI previously worked with the ATF for leniency in a prosecution, and currently works for the ATF for monetary compensation. Over the course of several investigations, the CI has proven to be reliable. The CI has multiple felony and misdemeanor convictions, including for narcotics and firearms related offenses, domestic violence, grand theft, and parole violations.

46. Based on my conversations with ATF agents, I know that a prior transaction between CASTENEDA and the CI involved approximately three ounces of methamphetamine. I understand that in this text message exchange, the CI was ordering another three ounces of methamphetamine.

47. The CI and CASTENEDA met for the sale the following day. Prior to the sale, the CI was searched for contraband and agents recovered none. The CI was provided with official funds for the operation and recording equipment.

48. At approximately 2:45 that day, the CI arrived in the area of 1000 Harrison Street in San Francisco and met with CASTENEDA. At that time, the CI gave CASTENEDA $600 in exchange for the three ounces of methamphetamine. After the exchange, agents met with the CI and took possession of the suspected narcotics, which weighed approximately 87.4 gross grams. A Tru-Narc test was conducted on the drugs and reported a presumptive positive for the presence of methamphetamine.

C. **CASTENEDA was recently arrested for engaging in a shooting in the Tenderloin.**

49. CASTENDA has a history of engaging in violent behavior in the Tenderloin. In June 2021, SFPD officers approached CASTENEDA on Larkin Street near O'Farrell Street after learning of his suspected involvement in an assault in the area. Officers recovered a large knife / machete in a black sheath on his right hip. They also found numerous individually wrapped baggies of suspected drugs in his jacket. Officers seized a backpack that CASTENEDA carried at the time, which contained a privately manufactured firearm (PMF)[7] Glock-style, 40-caliber, pistol loaded with six (6) rounds of ammunition, as well as 89.6 grams of methamphetamine (gross), 1.5 grams of heroin (gross), 24.0 grams of cocaine base (gross), 14.5 grams of cocaine powder (gross), and $519.00 in US currency. The methamphetamine tested presumptive positive for the presence of methamphetamine. The cocaine base and powder tested presumptive positive for the presence for cocaine. State charges relating to this arrest are currently pending.

---

[7] PMFs are colloquially known as "ghost guns" due to their lack of serial numbers.

50. On October 1, 2021, SFPD officers arrested CASTENEDA in relation to a shooting in the Tenderloin that occurred on September 14, 2021. Following the arrest, he was charged by the San Francisco District Attorney's Office with attempted murder, in violation of California Penal Code 644/187, assault with a firearm, in violation of California Penal Code Section 245(b), and possession of methamphetamine for sale, in violation of California Health and Safety Code Section 11378. At the time of this writing, I understand that CASTENEDA is currently in state custody pending further proceedings on these charges.

IV. **Drug trafficking activity of RAMOS.**

    A. **Agents intercepted calls between FERNANDO and RAMOS regarding narcotics trafficking.**

51. Over the course of the investigation, agents intercepted calls between FERNANDO and RAMOS (using a phone number ending in -6374).[8] For example, on July 22, 2021, RAMOS asked FERNANDO if he had "three" to sell him. RAMOS asked if it was the same kind. FERNANDO said, "Yes." RAMOS said he would "count the money." He asked FERNANDO to bring him "three of the white kind."

52. Based on my training and experience, I know that "white" is a common code word for powder cocaine because cocaine is the color white. I believe that on this call, RAMOS was ordering three units of cocaine.

53. About one week later, on July 30, 2021, RAMOS called FERNANDO and asked for "a pound" of the "nose." FERNANDO said he would be letting RAMOS down because he had none available for sale at the time, but that he was "trying to get some."

54. I believe that during this call, RAMOS tried to order a pound of cocaine for resale, but that FERNANDO was unable to supply that amount at that time. In addition to the word "white," I know that "nose" is another code word used by traffickers to reference cocaine because cocaine is typically ingested by inhaling the substance through the nose.

---

[8] I believe that RAMOS was the user of the number ending in -6374 because as explained herein, in June 2021, SFPD officers arrested RAMOS following an undercover purchase in the Tenderloin. At the time, RAMOS provided his phone number as -6374.

55. On another occasion, approximately one and a half months later, September 3, 2021, RAMOS called FERNANDO and asked how much he "had it for." FERNANDO responded, "125." RAMOS said, "three then." RAMOS asked FERNANDO to tell him when he was there. FERNANDO said he was going to be there in five minutes.

56. Based on my training and experience and participation in this investigation, I believe that FERNANDO and RAMOS negotiated a transaction for the sale of three units of an unnamed drug for a price of $125 per unit. Further, I know that it is common for traffickers who have a continued relationship with each other to be able to simply cite a number of units that they want to buy without noting the specific type of drug because the individual buys the same type of drug every time.

### B. In June 2021, an undercover SFPD officer purchased methamphetamine from RAMOS in the Tenderloin.

57. On June 30, 2021, an SFPD officer acting in an undercover capacity was walking on the south side of Eddy Street near Polk Street. RAMOS was standing on the north side of the street and motioned over to the officer. The officer said he wanted to buy $10's worth of methamphetamine. RAMOS then brought out a clear plastic bag containing a substance resembling methamphetamine. RAMOS provided the officer with a loose shard of the suspected methamphetamine in exchange for $10.

58. Following the sale, the undercover officer signaled to other nearby SFPD officers to come in to arrest RAMOS. At that time RAMOS began moving away and began running westbound on Eddy. SFPD officers pursued RAMOS and ultimately caught him near the corner of Eddy and Polk Streets.

59. Officers subsequently conducted a TruNarc test on the .4 net grams of methamphetamine purchased from RAMOS, which provided a presumptive positive result for the presence of methamphetamine. When arrested, RAMOS had an additional 2 net grams of crack and 13.4 gross grams of methamphetamine.

//

## CONCLUSION

60. I believe based on the foregoing facts that there is probable cause to believe that the Target Subjects have violated 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C). Intercepted calls, controlled purchased of drugs from the Target Subjects, seizures of drugs, and surveillance indicate that the Target Subjects work together to sell drugs in the Bay Area.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge and belief.

/s/
Brenton T. Reeder
Task Force Officer
Drug Enforcement Administration

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 13th day of October 2021.

HONORABLE THOMAS S. HIXSON
United States Magistrate Judge